UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

### Case No:  12-10072-CIV-MARTINEZ-GOODMAN

F.E.B. CORP., a Florida corporation,

       Plaintiff,

vs.

UNITED STATES OF AMERICA,

       Defendant.

---

### F.E.B.'S MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM OF LAW

---

F.E.B. moves for summary judgment on the grounds that there are no material facts in dispute and F.E.B. is entitled to judgment as a matter of law.

### Undisputed Facts

In a series of decisions prior to 1947, the Supreme Court indicated that the states held title to submerged land off their coasts. However, in *United States v. California,* 332 U.S. 19 (1947), the Supreme Court receded from its earlier rulings and held that the states did not own submerged coastal lands and that the federal government had paramount rights in such land.

In 1951, the Florida Trustees of the Internal Improvement Fund announced its intention to sell a spoil island now known as Wisteria Island.  In response to the

announcement, the Navy Bureau of Yards and Docks informed the Trustees that it considered the island to be property of the United States. [APP 080-081].   The Trustees conveyed the island to Paul E. Sawyer in 1952 without denying the government's claim of title. [APP 005-006].

In 1953, Congress enacted the Submerged Lands Act (SLA).   The SLA granted to the states title to and ownership of the lands beneath navigable waters within the states' boundaries, in Florida's case extending three marine leagues (approximately nine miles) into the Gulf of Mexico. 43 U.S.C., § 1301(b).   The SLA defined "lands beneath navigable waters" to include "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters." 43 U.S.C., § 1311(A)(2).

In 1967, F.E.B. acquired record title to Wisteria Island, succeeding a line of record title owners beginning with Paul E. Sawyer. [APP 005-013].   For over 60 years, F.E.B. and its predecessors have been assessed, and have paid, Monroe County ad valorem taxes as owners of Wisteria Island.   For over 47 years, F.E.B. has paid all real property taxes on Wisteria Island, identified its ownership of Wisteria Island on federal and state tax returns, maintained the island, and pursued development with Monroe County. [APP 014-034].   Never until 2011 was F.E.B.'s ownership of Wisteria Island challenged.   After passage of the SLA, the Federal Government never once prior to 2011 suggested that it had any ownership interest

in the island.  To the contrary, as illustrated below, the government, in both words and deeds, firmly communicated that it had no title to or interest in Wisteria Island.

Three years after the passage of the SLA, the Navy determined that Wisteria Island had strategic significance as a possible site for fuel storage tanks.  In a memorandum to the Chief of Naval Operations, the Chief of the Bureau of Yards and Docks, the same agency that had issued the 1951 letter claiming federal ownership, concluded that the Navy would have a weak claim to ownership of Wisteria Island. The Bureau recommended that the Navy consider condemnation proceedings. [APP 001-002].  The following year, the Navy sent a letter to five appraisers seeking to engage a firm to prepare an appraisal on Wisteria Island.  The letter to the appraisers stated that the Navy was "considering the acquisition" of Wisteria Island. [APP 035].

Ultimately, the Navy instead acquired Wisteria's sister island, later aptly named Tank Island, through condemnation.  In a 1961 agreement settling the condemnation case, the U.S. Justice Department stipulated that "the Internal Improvement Fund of the State of Florida owned and held the legal title to the said lands at the time of the taking herein." [APP 039-040].  The government purchased three other spoil islands in the same vicinity [APP 041-043, 082-088], but never acquired Wisteria Island.  In all material respects, Tank Island and the other three islands acquired by the government shared the same pedigree as Wisteria Island,

all of the islands having been created by federal dredging during the same relevant time span.

In 2004, 2005 and 2006, the Navy entered licensing agreements with F.E.B. whereby, at the Navy's request, F.E.B. authorized the Navy to conduct SEAL Team exercises on Wisteria Island.  The agreements acknowledged that Wisteria was "owned by F.E.B.  Corporation" and agreed that the island would be returned to F.E.B. in substantially the same condition that the property was in prior to the exercises. [APP 044-050].

In August 2011, a local anti-development activist in Key West, Naja Girard, contacted both the Federal Bureau of Land Management (BLM) and the U.S. Fish and Wildlife Service in an effort to get the Federal Government to claim title to Wisteria Island and thereby impede F.E.B.'s ability to develop the island.  [APP 051-053].  On August 26, 2011, the Fish and Wildlife Service informed Ms. Girard that Wisteria Island "was never considered a part of the public domain of the United States" and that the State of Florida "claimed sovereign rights to Wisteria Island under the authority of the Submerged Lands Act of 1953, which grants coastal states title to offshore lands within their historic boundaries, which is 3 marine leagues, as well as the rights to natural resources on or within those lands." [APP 054].   The conclusion was based upon information received from Nate

Felton, the Chief of the Bureau of Branch of Lands and Realty of the BLM. [APP 055].

Three months after the Fish and Wildlife Service informed Ms. Girard that the BLM didn't consider Wisteria Island part of the public domain of the United States, the BLM abruptly reversed position.  In a letter to Ms. Girard, sent without soliciting input from F.E.B. or other federal agencies, the BLM stated that after further review of records by Dominica Van Koten, Chief of the Branch of Cadastral Survey of the BLM, it had been determined that title to Wisteria Island was vested in the United States. [APP 056].  The letter was prepared and signed by Frankie Morgan, a BLM employee working under Nate Felton's supervision. The letter was sent without Mr. Felton's authorization. [APP 057].  The "research" by the Cadastral Survey office, which was responsible for conducting and validating surveys [APP058], had not been discussed with Felton and in his 25 years with the BLM, he had never before experienced the Cadastral Survey office conducting a similar evaluation or stepping in and changing a determination by the BLM. [APP 059].[1]

---

[1] There is no indication that Van Koten actually reviewed any surveys or historic documents. The Morgan letter made no reference to a 1976 Report by the then Chief of the Division of Cadastral Survey, based upon actual review of historic surveys and other relevant documents, which concluded that the area in which Wisteria Island is situated did not involve any public land and was tidal in character when Florida became a state.  [APP 060-062].

The conclusion that title to Wisteria Island was vested in the United States rested upon a demonstrably inaccurate assumption that Wisteria Island was a shoal that was reserved to the United States in Executive Order 4060, which the letter concluded was in effect when Florida became a state. [APP 056].   In fact, Executive Order 4060 was issued in 1924, 79 years after Florida became a state. [APP 063].   On deposition, Felton conceded that the letter sent to Girard by Frankie Morgan was inaccurate both as to the date of Executive Order 4060 and as to Wisteria Island being a shoal at the time the order was issued. [APP 064-065].

Nevertheless, shortly after issuance of the Frankie Morgan letter, with no effort to confirm its factual assumptions or conclusion, a news release was issued from the BLM stating that the Bureau had reversed its position and determined that the federal government owned Wisteria Island. [APP 066-067].  The news release was issued by Davida Carnahan, a Public Affairs Specialist with the BLM. According to Anne Morkill, an employee with the Fish and Wildlife Service, Carnahan confided to her at the time that Carnahan "used to live in Key West and often picnicked on Wisteria Island and she wanted to help environmentalists save the island from development." [APP 068-070].   The cloud on F.E.B.'s title was communicated to the Monroe County Attorney's office by the BLM. The county acknowledged the position of the BLM and recommended to the Monroe County Commission that further action on F.E.B.'s development application be halted

pending final determination of title. [APP 071-073].  F.E.B. was compelled to file this suit to clear the cloud from its title to Wisteria Island.

## Summary of Argument

Title to Wisteria Island was conveyed to the State of Florida by the United States in 1953 by enactment of the SLA. The act conveyed "title to and ownership of" submerged lands three marine leagues into the Gulf of Mexico, which included Wisteria Island.  The conveyance included "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters". Wisteria Island did not fall within any of the four exceptions included in the SLA.

F.E.B. holds valid title to Wisteria Island. The State of Florida conveyed title to a private owner in 1952 and title passed to F.E.B. in 1967.  The conveyance from Florida to private ownership immediately became valid upon passage of the SLA pursuant to the after-acquired-title doctrine, which is recognized by Florida, and by Florida statutes.

The statute of limitations included in the Quiet Title Act did not bar this action.  The Eleventh Circuit has held that the QTA statute of limitations does not begin to run at the time the government declares ownership unless the declaration is adverse to the ownership of the plaintiff at the time of the declaration.  The 1951 declaration by the United States that it owned Wisteria Island was not adverse to any ownership interests of F.E.B.'s predecessor because the U.S. Supreme Court

had held in 1947 that the states had no ownership of submerged lands off their coasts.  The first time the United States declared an ownership interest in Wisteria Island that was adverse to the interests of F.E.B. or any of its predecessors was in 2011.  After passage of the SLA, the United States consistently recognized private ownership of Wisteria Island until 2011 when, for the first time after the SLA, the Bureau of Land Management stated that the island was owned by the United States.

The assertion that the statute of limitations ran twelve years after the Navy issued its 1951 letter should also be rejected because it requires the assumption that Congress intended an unreasonable result. The SLA created a new right in the State of Florida and its successors-in-interest and it would be senseless to hold that QTA cuts off a party's ability to protect its property rights before those rights come into existence.

## Argument

**The Submerged Lands Act granted Florida full ownership rights to islands within the State's boundaries including the area where Wisteria Island is situated.**

The SLA, enacted by Congress in 1953, unambiguously granted to the states ownership of all lands within each state's boundaries that were submerged below navigable waters at the time the state was admitted to the Union, unless otherwise expressly excepted.  The statute provides, in pertinent part:

(a)     Confirmation and establishment of title and ownership of lands and resources; management, administration, leasing, development, and use;

It is determined and declared to be in the public interest that:

(1)     title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and

(2)     the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

(b)     Release and relinquishment of title and claims of United States; payment to States of moneys paid under leases

(1)     The United States releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources;

43 U.S.C., § 1311. The SLA's definition of "lands beneath navigable waters"

included islands such as Wisteria Island:

(a)     The term "lands beneath navigable waters" means—

(1)     all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to

the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction;

(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles;[2] and

(3) all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters, as hereinabove defined.

**Wisteria Island is not excepted from the Submerged Lands Act.**

The SLA expressly sets forth four exceptions to its grant of ownership to the states:

1. all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State;

2. all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea);

---

[2] 43 U.S.C., § 1301(b) defines "boundaries" for purposes of the statute to be "three marine leagues into the Gulf of Mexico." Whether it is geographical miles or marine leagues, it is undisputed that Wisteria Island was included.

3. all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity;

4. all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right;

43 U.S.C., § 1313.  The first and third exceptions have no applicability to Wisteria Island and the government does not suggest that either applies.  Only the second and fourth exceptions must be addressed.

Generally, statutory exceptions are to be narrowly construed and the party seeking to take advantage of an exception carries the burden of proof.  *United States v. Endotec. Inc.,* 563 F.3d 1187 (11th Cir. 2009).  There is no reason that these well-established rules of statutory construction should be disregarded in this case.  The Supreme Court acknowledged that the purpose of the SLA was to undo the effect of the Court's decision in *United States v. California*, 332 U.S. 19 (1947), in which it held that the states had no title to their coastal submerged lands. *United States v. California*, 436 U.S. 32 (1947).  Nothing in the language or congressional history of the SLA suggests that the exceptions should not be narrowly construed or that the Government should not have the burden of proving applicability of an exception.  In any case, the undisputed facts demonstrate that neither exception applies to Wisteria Island.

**Wisteria Island was not "expressly retained by or ceded to the United States" at the time Florida entered the Union.**

The SLA exempts from its grant of ownership to the state "all lands expressly retained by or ceded to the United States *when the State entered the Union.*" (emphasis added).   Thus, the SLA limits the second section 1313 exception to lands ceded to or retained by the United States as of the time Florida was admitted to the Union on March 3, 1845.[3]  Any subsequent reservation would have no relevance to the SLA grant, and any effort by the federal government to take over land granted to a state after that date other than by purchase, condemnation or other due process would be unconstitutional.

The first federal reservation of land produced by the Government that covered the area in which Wisteria Island was later situated is Executive Order 4060, issued 79 years after Florida became a State.[4]

---

[3] The SLA can only refer to Florida's admission in 1845 because there was no other admission. The Supreme Court has held that the declarations of cessation that lead to the Civil War had no validity, so the Confederate states never left the Union, and noted that the reconstruction acts after the war did not readmit the states to the Union, but only to "representation in Congress."  *Keith v. Clark,* 97 U.S. 454 (1878); *Texas v. White,* 74 U.S. 700 (1868).

[4] Nate Felton, under whose purported authority a letter was issued that changed the Bureau's position and contended that Wisteria Island was owned by the federal government, admitted on his deposition that Wisteria Island didn't exist in 1845, and that the letter's assumption that Executive Order 4060 predated Florida becoming a state was an error. [APP 064-065, 089].

**Wisteria Island was not "filled in, built up, or otherwise reclaimed by the United States for its own use".**

The SLA exempts from its grant of ownership to the State "all lands filled in, built up, or otherwise reclaimed by the United States *for its own use*; and any rights the United States has in lands presently and actually occupied by the United States under claim of right." (emphasis added).  Wisteria Island was not occupied by the United States when the SLA was enacted, so it is only the first phrase that requires discussion.  It is undisputed that the island was created by the deposit of submerged soil dredged by the federal government.  However, the undisputed evidence establishes that the island was not created by the government "for its own use."

Three years after enactment of the SLA, the Navy acknowledged that Wisteria Island was not created for the government's own use, and consequently, the government lacked a strong argument on which to claim ownership of the island.  The Navy had determined that the island had strategic value as a site for a fuel supply depot.  In a memorandum to the Chief of Naval Operations, the Chief of the Navy Bureau of Yards and Docks advised that whether or not the federal government owned Wisteria Island depended upon whether it was created by the government "for its use."  The Bureau concluded that because records indicated that the only purpose of the island was as a site for deposit of spoil, the Navy would have a difficult time proving that it was created for federal use and thus the

government had no strong argument on which to claim the island. Consequently, the Bureau recommended that Wisteria Island be obtained by condemnation:

> It is the opinion of this Bureau that: (1) if this island was built up for Federal use title to such land remains in the United States; or (2) if it cannot be established that the island was built up for Federal use the end result will be that the Navy is left without a strong argument on which to claim the island and, therefore, action to acquire this island by condemnation proceedings should be considered. ***It would appear that under provision (1) above the Navy would have a difficult time in proving that this island was built up for Federal use, inasmuch as the records indicate that the only reason for the establishment of the island in 1943 was a site for the deposit of spoil.*** It appears, therefore, that it will be necessary to acquire this island by condemnation proceedings.

(emphasis added) [APP 001-002].[5]   The memorandum is important not only because of its conclusion that Wisteria Island was not created for the government's own use, but for its timing as well. The island, as noted in the memorandum, was created in 1943, but during the time surrounding its creation, and during the entire 13 years between its creation and the Bureau of Lands and Docks memorandum, there is no record indicating that the government created Wisteria Island for its own use.

The Navy's concession is corroborated by the testimony of George Toppino. At the time of the dredging that resulted in the creation of Wisteria Island, Mr. Toppino was working for a company that was assisting in the preparation of

---

[5] The government ultimately decided instead to condemn a spoil island immediately adjacent to Wisteria on which it did construct fuel storage tanks. [APP 036-040].

several islands to receive the spoil from the dredging of a seaplane channel by the Navy.  He states that the spoil was placed on what is now Wisteria Island because the deposits reached maximum height on the other islands. He knew of no other purpose of the creation of the island and, despite living in Key West for years after the spoil deposits, he never observed use of the island by the government.[6]

No documents have been produced in this case that contradict Mr. Toppino's testimony or the Navy's concession in 1956 that Wisteria Island was not created for the government's own use, or Navy's conclusion that the government would have to condemn the island in order to obtain ownership.  In fact, prior to this dispute, the government's consistent conduct after enactment of the SLA implicitly recognized that it had not become owner of spoil islands off the coast of Key West simply because it had created them.  Wisteria Island is one of five spoil islands off the Key West coast that were created by federal dredging.  Four of them were acquired by the federal government either by purchase or condemnation and thereafter were shown on official government maps and charts with the designation "US Naval Res" or "U.S. Government Reservation." [APP 074, 078-079].  It is undisputed that the government never acquired Wisteria Island by purchase or

---

[6] Mr. Toppino's deposition transcript had not been received from the court reporter at the time of filing this motion.  Counsel for the parties have stipulated that reference to the testimony could be made and the transcript excerpts filed later.

condemnation, and no official map or chart has been produced that indicates Wisteria Island belonged to the federal government.

**F.E.B. holds legal title to Wisteria Island under Florida law.**

This issue is relevant as to F.E.B.'s standing to pursue this action.  F.E.B. has standing because it holds record title as the current owner of an unbroken line of deeds issued in accordance with Florida law, beginning with a deed from the Florida Trustees of the Internal Improvement Fund to Paul E. Sawyer in 1952. [APP 005-013].  The issue of whether the deeds were valid even though Florida did not have title in 1952 was briefed in response to the Court's April 26, 2013 Order Requiring Parties to Brief Issues (Doc 31).  F.E.B. argued that the deeds were valid because Florida follows the after-acquired title doctrine and because Florida has recognized such deeds by statute.  F.E.B.'s argument on this issue appears at pages 5 through 7 of F.E.B.'s memorandum (Doc 36) and is incorporated herein.

Beyond standing, the ownership of Wisteria Island as between F.E.B. and the State of Florida is a matter of Florida law that is beyond the jurisdiction of this Court because it has not been presented to the Court by Florida and F.E.B. for adjudication, because there is no case or controversy between Florida and F.E.B., and because the Court is barred by the Eleventh Amendment from adjudicating whether Florida has complied with its own laws.

**This action is authorized by the Quiet Title Act, 28 U.S.C. § 2409a.**

The government moved to dismiss on the ground that the action is barred by the 12-year statute of limitations in the Quiet Title Act (QTA), 28 U.S.C. § 2409a. The Court denied the motion and a motion for reconsideration without prejudice. (Docs 38, 39).   No documents that support the government's view of the limitations issue have been produced since denial of the motion to dismiss, and the undisputed evidence entitles F.E.B. to judgment on the limitations issue as a matter of law.

The QTA waives sovereign immunity and authorizes suits against the United States to adjudicate disputed title to real property:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest.

28 U.S.C., § 2409a (a).  The act requires that a civil action be commenced within twelve years of the date upon which it accrued, which is defined to mean the date the plaintiff or the plaintiff's predecessor in interest knew or should have known of the claim of the United States. *Id.* at § 2409a(g).  The sole notice upon which the government relies is a letter from the Chief of the Navy Bureau of Yards and Docks to the Florida Trustees of the Internal Improvement Fund dated September

27, 1951, two and a half years before enactment of the SLA. [APP 080-081].[7]  No

subsequent notice has been produced.  For the reasons discussed below, the Court

should hold that the statute of limitations does not bar this action.

**The statute of limitations did not begin to run prior to the enactment of the
SLA because there was no government claim of title to Wisteria Island that
was adverse to the interests of F.E.B. or its predecessors prior to that time.**

The QTA gives a federal court jurisdiction only "to adjudicate *a disputed*

*title* to real property in which the United States claims an interest." 28 U.S.C., §

2409A (emphasis added); *Lesnoi, Inc., v. United States,* 170 F.3d 1188 (9th Cir.

1999).  When the Navy issued its 1951 letter, its claim of ownership was not

subject to dispute. In *United States v. California,* 332 U.S. 19 (1947), the Supreme

Court receded from earlier rulings and held:

> [W]e decide for the reasons we have stated that California is not the
> owner of the three-mile marginal belt along its coast, and that the
> Federal Government rather than the state has paramount rights in and
> power over that belt . . . .

*Id.* at 332 U.S. 38.  The Supreme Court decision closed the courthouse door to any

challenge to federal ownership of submerged lands, including Wisteria Island, until

---

[7] The Navy produced the 1951 letter upon which it relies, but failed to timely
produce, in response to a FOIA request and a request for production, the 1956
letter in which the same Bureau concluded that it lacked a strong case for Federal
ownership of the island because it was not created for the government's own use.
The 1956 letter was uncovered by F.E.B. in a search of Naval archives in
Washington, D.C. and was only produced to F.E.B. on April 17, 2014 after F.E.B.
had sent a copy to the government.

Congress enacted the SLA in 1953 and conveyed all right, title and interest to such lands to the States.

The government is urging this Court to hold:

  (1)   that the limitations provision of the QTA runs and forever bars a party's ability to have its title adjudicated before that party even acquires title and before a cause of action accrues; and

  (2)   that having run before a cause of action accrues, the limitations provision bars a quiet title suit even though the United States Congress subsequently expressly grants title to the property at issue.

It is important to note that such a holding would not only bar action by F.E.B., but would have barred action by the State of Florida to enforce the title granted in the SLA, despite the clear intent of Congress to convey "all right, title and interest," and "the power to manage, administer, lease, develop, and use" the island.  Such a holding would fail to serve the will of Congress.  *See Lesnoi, Inc. v. United States,* 170 F.3d 1188, 1193 (9th Cir. 1999) ("We are aware that waivers of sovereign immunity are to be strictly construed in favor of immunity [citation omitted], but we are also subject to a duty to construe federal statutes in a manner that will accomplish their intended purpose. *See Bob Jones University v. United States,* 461 U.S. 574 . . .)."  Such a holding would also defy logic and would be inconsistent with the holdings of the Eleventh Circuit and other federal courts.

**The statute of limitations did not begin to run until the United States gave notice after enactment of the SLA of a claim to Wisteria Island that was adverse to the ownership interests of F.E.B. or its predecessors, which did not occur until 2011.**

The Eleventh Circuit has held that the limitations provision of the QTA does not begin to run when a party has notice of the United States' claim of ownership of property in the absence of a claim or act by the United States that is *adverse* to the party's asserted interest.  *Werner v. United States,* 9 F.3d 1514 (11th Cir. 1993). In *Werner*, the plaintiff claimed a statutory easement for ingress and egress over a road that crossed Eglin Air Force Base property.  The plaintiff had actual notice of the government's ownership, but did not sue until the government cut off access to the road, which was more than 12 years after the plaintiff received notice of government ownership.  The district court entered judgment for the government based upon the QTA's 12-year limitation. The Eleventh Circuit reversed, holding:

> The government contended, and the district court accepted, that the statute of limitations issue turned upon whether plaintiffs and their predecessors in interest either knew or should have known for more than 12 years before filing suit that the government claimed some interest in or ownership of the Eglin property. From the facts we have set out it was obvious that plaintiffs and their predecessors in title knew or should have known of government ownership or interest for more than 12 years, so summary judgment was granted. But the position of the government, adopted by the district court, misperceives the issue. . . . The limitations issue then turns upon whether, prior to the erection of the gate, plaintiffs or others had been permitted to utilize the road for access to plaintiffs' property and, if plaintiffs or others had been so permitted, when did plaintiffs know, or should have known, that the government had changed its position

and, adversely to the interests of plaintiffs, denied or limited the use
of the roadway for access to plaintiffs' property.

*Werner* at 9 F.3d 1516.

When the Navy asserted ownership in 1951, the essential element of
adversity was missing. Even if the 1951 letter were considered adverse, the United
States conveyed all of its right, title and interest in the property two years later –
well before the statute of limitations would have run – when Congress enacted the
SLA. Adversity thereafter first arose in 2011 when the government asserted that it
continued to own Wisteria Island despite the SLA, and acted affirmatively to cloud
F.E.B.'s title.

In *Werner, Id.,* the Eleventh Circuit cited several cases, *Park County,
Montana v. U.S.,* 626 F.2d 718 (9th Cir. 1980), *Narramore v. U.S.,* 852 F.2d 485
(9th Cir. 1988), *Kinscherff v U.S.,* 586 F.2d 159 (10th Cir. 1978) and *Elk Mountain
Safari,Inc. v. U.S.,* 645 F.Supp. 151 (D. Wyoming 1986) "in which principles
applicable to [*Werner*] are illuminated." *Werner* 9 F.3d at 517.

In *Park County* and *Kinscherff*, the plaintiffs had notice of the United States'
ownership of the property more than 12 years before filing suit, but believed they
had legal easements for traversing the property. The appellate courts held that the
QTA statute of limitations did not begin to run until the government first gave
notice that it denied the existence of the easement or took action to interfere with

exercise of the easement.  The Eleventh Circuit described the facts and holding in

*Park County:*

> The court of appeals agreed with the district court that plaintiffs knew or should have known of the claim of the United States to the purported right of way more than 12 years before the suit was brought. But the court did not measure the beginning of the limitations period from 1902, when the government became owner of the property, or from the time the Forest Service began maintaining trails in the early part of the twentieth century, or from 1932 when the relevant part of the property was established as a Primitive Area, but rather from 1962, when the rock barrier and the sign were placed, prohibiting the use by motor vehicles.

*Id.* at 1517.

In *Kinshcherff,* the plaintiff claimed an access easement across United States property.  The Tenth Circuit denied a motion to dismiss based on the QTA statute of limitations, holding that the question of whether the plaintiff knew or should have known of the government claim of no easement required an evidentiary hearing. The Eleventh Circuit explained what it considered the pertinent holding in the case:

> In *Kinscherff,* as in the present case, the triggering event for statute of limitations purposes was not the time at which the claimants knew that the government was owner but the time at which they knew or should have known that the government claimed that it could deny use by the plaintiffs of the access road to their property because there was no easement (or only a limited easement) permitting such use.)

*Id.* at 1518.

*Narramore* involved a government dam and reservoir constructed pursuant to Congressional recommendations that included a schedule for the release of flood waters referred to as "Plan A".  Landowners affected by the releases sued to compel compliance with Plan A.  The court dismissed on the ground that the plaintiffs had more than 12 years notice of the government's releases.  In a second suit several years later, the court denied a motion to dismiss based on the statute of limitations, finding that there was a factual issue as to whether the plaintiffs had actual or constructive notice of the government's position regarding compliance with Plan A.  The difference in the two suits was that the government had earlier claimed that Plan A was still in effect, but by the time of the second suit, the government was asserting that it had adopted a policy of non-compliance with Plan A.  The Eleventh Circuit explained what it considered the important holding of *Narramore*:

> Thus, in *Narramore*, as here, the plaintiffs showed rights or benefits previously enjoyed, in that case pursuant to a formalized plan, in this case pursuant to permissive usage, which the government asserted that it could remove or limit. In *Narramore,* the date that triggered the beginning of the 12-year statute of limitations period was not the date on which the landowners acquired knowledge that the government was owner and operator of the dam and reservoir but the date on which knowledge was acquired that the government was seeking to impose limitations or restrictions on the Plan A benefits that the landowners enjoyed from the government with respect to the property.

*Id.* at 1517.

The above cases are factually and legally analogous to the case at bar. After the SLA became law, F.E.B. and its predecessors in title believed they owned Wisteria Island and possessed it openly, paying taxes, maintaining the island, erecting no trespassing signs, and granting the Navy written permission to use the island.  The government, which also believed the private deed-holders owned the island, never declared otherwise or interfered with the deed-holders use of the island until 2011.  That year, for the first time, the government announced that it interpreted the SLA as excepting Wisteria Island from the grant to Florida (an interpretation the government later conceded was incorrect).  Based on the holdings of *Werner* and the cases it cites, the events that triggered the statute of limitations in this case were not the government's undisputed claim of ownership prior to enactment of the SLA, but the government's announcement in 2011 of its new interpretation of the SLA and the resulting cloud that it placed on F.E.B.'s title.

In its order denying the government's motion to dismiss, this Court stated:

"[T]wo conditions must exist before a district court can exercise jurisdiction over an action under the QTA: 1) the United States must claim an interest in the property at issue; and 2) there must be a disputed title to real property.  If either condition is absent, the Act in terms does not apply and the district court lacks jurisdiction to entertain the action."  *Lesnoi, Inc. v. US.,* 170 F.3d 1188, 1191 (9th Cir. 1999).  "It makes no sense to start limitations running because of an event that creates no dispute and is not involved in the controversy against which a limitations defense is asserted."  *Lesnoi, Inc. v. US.,* 267 F.3d 1019, 1025 (9th Cir. 2001).

Doc 38, p. 8.  To hold that the statute of limitations ran against F.E.B. because it failed to timely file suit despite the fact that it had no earlier access to court to assert its rights not only makes no sense, it very probably would be a violation of due process.

Even if it could reasonably be argued that the government's 1951 claim of title was adverse to the interests of F.E.B.'s predecessor, F.E.B. would still be entitle to summary judgment.  Whatever property rights could have been at issue in 1951 ceased to exist in 1953.  When Congress passed the SLA, it created an entirely new right in the State of Florida.  The suggestion that Florida and its successors-in-interest lost a right of action by failure to timely file before the right came into existence would be an absurdity. Fundamental rules of statutory construction hold that courts should not interpret statutes in a manner that produces absurd results.  *Durr v. Shinseki,* 638 F.3d 1342 (11th Cir. 2011).

**The evidence of the government's historic words and deeds is utterly inconsistent with the position it presents to this court.**

The undisputed facts disclose that, from the enactment of the SLA until 2011, the federal government has consistently expressed the position that it had no ownership interest in Wisteria Island. Of the five spoil islands created by federal government dredging off the Key West coast, the government acquired four by purchase or condemnation, and each was thereafter shown on official nautical

charts as federal property. The government never purchased or attempted to purchase Wisteria Island and the island is not shown on those same charts or any other charts produced in this case as federal property.

Until the 2011 letter that precipitated this litigation, every time after enactment of the SLA that the Federal Government considered the question of ownership, it concluded that it had no ownership of Wisteria Island. On the only three occasions that the federal government has ever used Wisteria Island, in 2004, 2005 and 2006 for Navy SEAL Team exercises, it has sought and received licenses from F.E.B. to do so in written agreements that expressly acknowledged F.E.B.'s ownership of the island.

The Department of Interior itself has stated that Wisteria Island has never been part of the public domain of the United States and is not part of the Key West National Wildlife Refuge. [APP 054].

The government has also shown little interest in or reason to use Wisteria Island other than for the SEAL Team exercises. Its initial consideration in 1956 of acquiring Wisteria Island for fuel storage tanks was quickly abandoned in favor of what became known as Tank Island.   On the only occasions on which the government actually did use Wisteria, it did so with written licenses from F.E.B. in which it acknowledged F.E.B.'s ownership, and the last time that occurred was 8 years ago.

The cloud on F.E.B.'s title did not result from a perceived need by the federal government for use of Wisteria Island or a sudden realization that it had been wrong for half a century and did, in fact, own Wisteria Island.  It resulted from two ill-conceived documents: (1) a poorly researched letter to an anti-development activist that was issued by a lower-level federal employee without his supervisor's approval, without first affording F.E.B. the opportunity to be heard, and apparently without prior title search or other legal review, a letter that was conceded by the supervisor under oath to have been inaccurate in all material respects; and (2) a press release rushed to the media immediately after the aforesaid letter, without prior review by other interested and knowledgeable personnel, by a BLM employee who confided to another federal employee at the time that she had a personal interest in Wisteria Island and was motivated by a desire to help an activist. To borrow a phrase from an internal U.S. Fish and Wildlife service email referring to the BLM letter and the press release, "this is the wrong way to do business." [APP 069].

The federal government has no jurisdiction over, and no business involving itself in, a local development battle that involves no federal laws or regulations and no federal property.  It certainly has no business clouding a citizen's title in order to aid one side in such a battle.  The government has subjected F.E.B. to an expensive and egregiously inequitable ordeal in an effort to deprive the company

of the rightful use of its property.  It is in just such a situation that citizens can turn

to federal courts for protection and remedy.  Summary judgment should be entered

for F.E.B.

> s/ BARRY RICHARD
> BARRY RICHARD
> FLORIDA BAR NO. 105599
> **GREENBERG TRAURIG, P.A.**
> 101 EAST COLLEGE AVENUE
> TALLAHASSEE, FL  32301
> TELEPHONE:  (850) 222-6891
> FACSIMILE:  (850) 681-0207
> RICHARDB@GTLAW.COM
>
> Attorneys for Plaintiff
> F.E.B. CORP

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was

served by registered electronic mail this 5th day of May, 2014, upon:

Anthony Erickson-Pogorzelski, Esq.
Assistant U.S. Attorney
99 N.E. 4th Street, 3rd Floor
Miami, Florida  33132
*anthony.pogorzelski@usdoj.gov*

> s/ BARRY RICHARD

*TAL 451840375v1*