UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

Case No: 12-10072-CIV-MARTINEZ-GOODMAN

F.E.B. CORP., a Florida corporation,

    Plaintiff,

vs.

UNITED STATES OF AMERICA,

    Defendant.

## F.E.B.'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The motions for summary judgment reveal that there is substantial agreement as to the facts and legal principles material to adjudication of the merits of this case. Consequently, the scope of issues that must be addressed by the Court have been significantly narrowed.

**F.E.B. Holds Title to Wisteria Island**

It is clear from the parties' memoranda that this Court's adjudication of the merits rests upon its interpretation of the Submerged Lands Act ("SLA"). The government does not and cannot deny that Congress, upon passage of the SLA in 1953, conveyed to the State of Florida "all right, title and interest of the United States" in submerged lands extending three marine leagues from the Florida coast

into the Gulf of Mexico, subject only to several express exceptions. There is no factual dispute that Wisteria Island is situated within that area. The government also does not deny that Florida follows the after-acquired-title doctrine and that the effect of the doctrine is to validate F.E.B.'s title to Wisteria Island if Florida received title upon passage of the SLA. The government's argument on the merits comes down to a single premise: that Wisteria Island is subject to the exception in the SLA for "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." 43 U.S.C., § 1313(a).[1]

The government begins its argument regarding the SLA exception by asserting that, because the SLA involves a grant of federal lands, it must be construed strictly in favor of the United States. In support of this proposition, the

---

[1] The government invokes a second exception in 43 U.S.C. § 1313 by stating that, "there is evidence that the Subject Property was 'expressly retained by or ceded to the United States when the State entered the Union' and that the Subject Property was 'presently and actually occupied by the United States under a claim for right'." U.S. Brf, p. 9, fn6. The government states that it is not bothering to cite such evidence because the issue is disputed and the evidence would therefore be irrelevant to the government's motion for summary judgment. Since the government seeks to fall within an exception, it carries the burden of proving that the exception is applicable. *See United States v. First City National Bank of Houston*, 386 U.S. 361 (1967). It must produce evidence to support its assertion that it falls within the exception if it is to withstand F.E.B.'s motion for summary judgment. The 'retained, ceded or occupied' exception does not refer to some generalized reservation. Congress was quite explicit in noting that the retention or cession must be "otherwise than by a general retention of cession of lands underlying the marginal sea," and there is no evidence in the record of retention, cession, or occupation of Wisteria Island when Florida became a state. To the contrary, the undisputed evidence is that Wisteria Island did not even exist at the time. [Pl. App. 0089]

government cites *California v. United States*, 457 U.S. 273 (1982). Following its citation to the *California* case, the government includes a 'cf' citation inviting the Court to compare *United States v. Alaska*, 521 U.S. 1 (1997). The *Alaska* case is more significant than the citation would suggest. The *California* case was materially distinguishable from the case at bar for reasons discussed more fully below. On the other hand, the *Alaska* case is directly on point. In *Alaska*, as in this case, the government argued that the SLA had to be strictly construed. The Supreme Court rejected the argument stating:

> The Submerged Lands Act grants States submerged lands beneath a 3-mile belt of the territorial sea. The statute is a grant of federal property, and the scope of that grant must be construed strictly in the United States' favor, but that principal does not permit us to ignore the statutes' terms, which provide that a State receives title to submerged lands beneath the territorial sea unless the United States "*expressly* retain[s]" them. 43 U.S.C. § 1313(a) (emphasis added). We cannot resolve "doubts" about whether the United States has withheld State title to submerged lands beneath the territorial sea in the United States' favor, for doing so would require us to find "express" retention of submerged lands where none exists. [Citations omitted]. But Congress has chosen to exercise that authority by presumptively granting those lands to the States, unless the United States "*expressly* retained" submerged lands.

*Id.*, 521 U.S. at 35.

The *Alaska* case dealt with the "expressly retained" clause of the SLA's exceptions provision, but the Court's reasoning applies as well to the "filled in,

built up, or otherwise reclaimed" exception in the same provision.  As with the "expressly retained" language, Congress has chosen to exercise its authority by presumptively granting submerged lands to Florida unless the United States "filled in, built up, or otherwise reclaimed" a portion of those lands "*for its own use.*" [emphasis added].  In any case, regardless of how strictly this Court construes the exception language, the undisputed evidence shows (as recognized by the government itself before it found itself enmeshed in this litigation) that the exception is not applicable to Wisteria Island.

The evidence is undisputed that Wisteria Island was created by the dumping of submerged spoil resulting from a dredging operation, the purpose of which was to create a seaplane channel.  This is supported by the 1956 memorandum from the Navy Chief of Bureau of the Yards and Docks to the Chief of Naval Operations, the testimony of George Toppino, and a Congressional Appropriations Report [Pl. App. 001-001; 003-004 (Toppino deposition received and filed after Appendix)], none of which is challenged by the government.  Moreover, the BLM's own Nate Felton testified that he had never seen a chart that showed anything in the location

of Wisteria Island in 1924. [Pl. Supp. App. 90].[2]  In any case, it makes no difference for purposes of summary judgment whether Wisteria Island resulted from dredging in 1924 or 1944 in the absence of evidence that the island was created for the government's own use.

F.E.B. has cited substantial evidence relating specifically and expressly to Wisteria Island showing that the government had no plans for use of Wisteria Island at the time of its creation.  The most compelling evidence is the Navy's own 1956 letter concluding that it had a weak case for ownership because the island was not created for its own use [Pl. App. 001-002], the testimony of George Toppino who personally worked on the dredging and filling of the island in the 1940's (received and filed after F.E.B.'s appendix), and the fact that the United States simultaneously purchased four of the five spoil areas in the vicinity of Wisteria Island in 1946, but never purchased Wisteria. [Pl. App. 041-043] In addition to this evidence, the record shows that on three separate occasions after enactment of the SLA, the federal government conducted inquiries as to whether it

---

[2] All of this evidence is in agreement that Wisteria Island was created by dredging of a channel in 1943. The government does not deny that dredging spoil was deposited at the site of the island in 1943, but states that the United States conducted a dredge project "in Key West Harbor" in 1923, citing an annual report of the Chief of Engineers. The report says nothing to indicate that anything was deposited on the site where Wisteria Island is situated.  The government also makes reference to a 1924 nautical chart, which, it says, "identifies the creation of a 'spoil area' on the "subject property" after the completion of the 1920's dredge project.  The chart does not show any island, much less anything resembling Wisteria Island, in the location where the island now exists.

could establish ownership of the island and concluded all three times that it could not. [Pl. App. 0060-0061; 001-002; 0089]. Ultimately, the federal government determined in 1956 that the only way to obtain title to Wisteria Island was by condemnation. [Pl. App. 001] After seeking appraisals on Wisteria Island in 1957 [Pl. App. 035], the government abandoned any effort to obtain title to the island. Instead, it commenced condemnation of a nearby spoil area that became known as Tank Island (now Sunset Key) on which the government erected fuel storage tanks. [Pl. App. 036-040]

In response to this evidence, the government has failed to produce any documents created during or around the time of creation of Wisteria Island, or any testimony relating to events that occurred at such time, indicating that the government had any intention at the time of its creation to use the island for any purpose. In the absence of relevant evidence, the government makes general statements that it always had plans for use of "the Subject Property". The government defines "the Subject Property" as including Wisteria Island. However, its representations regarding the government's intended use of Wisteria Island are either undocumented or refer to documents that make no apparent reference to Wisteria Island on their face, and for which the government produces no testimony or other documents indicating that Wisteria Island was a subject of the cited

documents. *See* Def. Brf, pp. 4, 9, 12, 15, 16, 17, 18.[3] Moreover, whatever the locations may have been, most of the uses referred to were prior to the creation of Wisteria Island in 1943, and the remaining ones were well after its creation.

The only cited source that directly or indirectly refers to Wisteria Island is a book titled *"Spoil Island"* authored by Charlie Hailey. Mr. Hailey is not identified on the government's witness list as an expert and the government offers no credentials to establish him as an expert. His book simply states that he "teaches design, theory, and history in the University of Florida's School of Architecture." The book, in turn, references *Robert Smithson: The Collected Writings*, in support of the representation that a 1924 executive order encompassed Wisteria Island. Robert Smithson was an artist and the referenced book is a collection of Mr. Smithson's essays on art and culture. *See http://www.amazon.com/Robert-*

---

[3] Typical of the government's citation to non-existent authority is its statement that the Trustees of the Internal Improvement Fund were trying to sell Wisteria Island in 1924 and that this precipitated a Navy request for an executive order reserving the area. US Brf, p. 17. The statement is followed by a citation to minutes of the Trustees filed by the government as D.E. 58-11. The cited document makes no mention of Wisteria Island. This is understandable since the location given in the minutes for the island to be sold is not the location of Wisteria Island, as shown by the government's own documents. The Trustees minutes give the location of the property the Trustees were trying to sell as "Section 6, Township 68 South, Range 25 East." Contrast this to the 2011 letter from the Bureau of Land Management to activist Naja Girard, which describes the location of Wisteria Island as "Section 36, Township 67 South, Range 24 East and Section 31, Township 67 South, Range 25 East," a completely different location. [Pl App. 0056]

*Smithson-The-Collected-Writings/dp/0520203852/ref=sr_1_1?ie=UTF8&qid= 1400512795&sr=8-&keywords=robert+smithson+the+collected+writings.*

The government relies heavily on *California v. The United States*, 457 U.S. 273 (1982). The case is materially distinguishable from the case at bar with respect to both its facts and its holding. The *California* case involved coastal property of which the upland was owned by the United States, which used the property as a Coast Guard reservation. The land was extended further into the ocean by accretion resulting from erection of jetties by the government. The question in the case was whether the applicable law was California law − which holds that natural accretion belongs to the upland owner, but artificial accretion does not − or federal law, which provides that both types of accretion belong to the upland owner. The Supreme Court held that federal law was applicable and, consequently, the accretion added to the land owned by the United States as upland owner. The Court commented without analysis that the accreted land would also fall within the SLA exception for land "filled in, built up, or otherwise reclaimed." The comment provides little guidance for the case at bar. The case does not mention the purpose of the jetties, but there is no reason to assume that they were built for anything other than protection or extension of the upland on which the government maintained a Coast Guard reservation. That is a far cry from the circumstances surrounding the creation of Wisteria Island. The plain language of

the SLA exception is clear.  It applies to land created for the purpose of government use, not land that is simply a byproduct of dredging for a purpose unrelated to the disputed land.

The government briefly proposes two additional arguments with respect to the phrase "for its own use."  First, the government argues that the phrase was intended to exclude only land created by the United States for someone else's use.  The argument ignores a third option which the undisputed evidence shows was actually applicable to Wisteria Island: the island was not intended for any use at the time of its creation.  It was just a place to deposit discarded soil.

The government next argues that Wisteria Island was created for its own use because the government used it as a spoil site.  The argument is effectively saying "the government created the island for its own use as a spoil site because it was created by the government as a spoil site."  In addition to being a meaningless tautology, the argument would render the phrase "for its own use" meaningless since it would apply to any land built up, filled in or reclaimed by the United States.[4]

Both of the above arguments would share an additional flaw.  Both would apply to Tank Island as well as Wisteria Island, both islands having been created

---

[4] It is not clear whether the government is suggesting that it had plans to use the spoil material itself rather than the island. If it is, the assertion is unsupported by the record. There is no evidence that there was ever any intention to use the spoil deposited on the Wisteria Island site or that the government ever did so.

adjacent to each other in the same time frame by federal dredging. But the government acknowledged in 1961 that Tank Island belonged to the State of Florida. The acknowledgement was made in a formal stipulation filed with a United States District Court in support of the government's condemnation proceeding. [Pl. App. 036-040]

**This Action is Not Barred by the 12-Year Statute of Limitations in the Quiet Title Act**

The government argues that it is not necessary for there to be a dispute regarding title for the statute of limitations under the Quiet Title Act to begin running. In support, the government cites *McMaster v. United States*, 177 F. 3d 936 (11th Cir. 1999), arguing that the case stands for the proposition that the requirement that there be a "dispute to title" in Section 2409 A(a) of the Quiet Title Act is for jurisdictional purposes only and does not apply to the statute of limitations. There was no limitations issue in *McMaster*, and the court makes no reference to the limitations provision of the Quiet Title Act. On the other hand, in *Werner v. United States*, 9 F. 3d 1514 (11th Cir. 1993), the Eleventh Circuit directly addresses the limitations provision in the specific context applicable to the case at bar.

As discussed in greater detail in F.E.B's motion for summary judgment, *Werner* holds that a claim of title by the government is insufficient in the absence of actual interference by the government with a plaintiff's property rights. In

*Werner* and the several cases cited by it, the plaintiffs were aware of the government's claim of ownership of the subject property for more than 12 years, but it was held that the statute of limitations did not begin to run until the government actually interfered with the plaintiffs' use of the property. The same is true in the case at bar. The government claimed ownership of Wisteria Island in 1951, but never made any effort to stop F.E.B. and its predecessors from using the island prior to 2011.

The most compelling obstacle to the government's assertion that the statute of limitations has run is the fact that the United States conveyed title to Wisteria Island to the State of Florida in 1953 when Congress passed the SLA. As more fully discussed in F.E.B.'s motion for summary judgment, once the SLA created a new property right in the state, the statute of limitations did not begin to run until the government claimed that it owned the island despite passage of the SLA. It would be irrational for the law to require a person to take action to preserve a right before the right exists is challenged. The right created by the SLA did not exist until 1953, and the government did not challenge that right until 2011.

The government does not quarrel with the proposition that a newly created property right would require a new notice of dispute for the statute of limitations to begin running. Instead, the government argues that no new property right to Wisteria Island was created by the SLA because Wisteria Island was not included

in the SLA conveyance. This, according to the government, is because Wisteria Island was subject to the 'filled in, built up, or otherwise reclaimed' exception. It has thus now become clear that adjudication of both the merits and the limitations issues rest upon the single determination of whether Wisteria Island fell within this one exception. For the reasons discussed above, both logic and undisputed evidence lead to the conclusion that Wisteria Island was not excepted from the SLA conveyance.

There is an additional reason that the limitations period has not run. In its denial of the government's motion to dismiss, this Court noted that, "The statute-of-limitations language in section 2409a(f) sets out a test of reasonableness governing constructive notice of government real property interests in quiet title actions against the United States." (quoting *D.C. Transit Sys., Inc. v. United States*, 717 F.2d 1438, 1441 (D.C. Cir. 1983)). In this case, the government is effectively arguing that F.E.B. had constructive notice of the government's claim that it still owned Wisteria Island after passage of the SLA because of the act's "filled in, built up, or otherwise reclaimed' exception. The government can hardly argue that F.E.B. was reasonably on notice of this position when the government itself concluded that the exception did not apply, first through the Navy in 1956 and then through the BLM in 2011 before the BLM suddenly reversed course.

**S/ BARRY RICHARD**
BARRY RICHARD
FLORIDA BAR NO. 105599
GREENBERG TRAURIG, P.A.
101 EAST COLLEGE AVENUE
TALLAHASSEE, FL  32301
TELEPHONE:  (850) 222-6891
FACSIMILE:  (850) 681-0207
RICHARDB@GTLAW.COM

Attorneys for Plaintiff
F.E.B. CORP

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by registered electronic mail this 21st day of May, 2014, upon:

Anthony Erickson-Pogorzelski, Esq.
Assistant U.S. Attorney
99 N.E. 4th Street, 3rd Floor
Miami, Florida  33132
*anthony.pogorzelski@usdoj.gov*

**S/ BARRY RICHARD**

*TAL 451846920v6*