**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-10072-CIV-MARTINEZ/GOODMAN**

**F.E.B. CORPORATION,**

      **Plaintiff,**

**vs.**

**UNITED STATES OF AMERICA,**

      **Defendant.**

_____/

## THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO F.E.B.'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Defendant, United States of America, by and through the undersigned Assistant United States Attorney, hereby responds in opposition to F.E.B.'s Motion for Summary Judgment and Memorandum of Law [D.E. 57] and, therein, establishes that this case must be dismissed for lack of subject matter jurisdiction or, should the Court reach the merits, that summary judgment should be entered in favor of the United States; and, in support thereof, states the following:

**I.**       **Plaintiff's Arguments Lack Merit: Judgment Should Be Entered In Favor of the United States**

Plaintiff, F.E.B. Corporation, has repeatedly tried to use artful pleadings in an effort to circumvent the Quiet Title Act's (QTA), 28 U.S.C. § 2409a, 12-year statute of limitations in this case. The Motion for Summary Judgment is no different. In the Motion, Plaintiff initially repeats its erroneous contention that a "disputed title" is required, in addition to notice of the claim of the United States, in order to accrue the statute of limitations. The QTA mandates that the statute of limitations "shall be deemed to have accrued" upon actual notice of the claim of the United States. 28 U.S.C. § 2409a(g). There are no additional requirements for accrual.

Subsequently, Plaintiff appears to be arguing an alternative theory, which is equally unavailing. Plaintiff argues that the statute of limitations cannot accrue unless and until **the plaintiff has a valid legal claim** to title—regardless of the actual notice of **the claim of the United States**. Plaintiff's argument is nothing more than a self-serving artful pleading that defies logic and law. Finally, Plaintiff argues that the claim of the United States could not accrue the statute of limitations in light of <u>Werner v. United States</u>, 9 F.3d 1514 (11th Cir. 1993) and other cases analyzing easement rights. This argument has been previously briefed and is patently incorrect. The QTA's statute of limitations accrued in 1951, when Florida, Plaintiff's predecessor in interest, had actual notice of the claim of the United States. Plaintiff filed its QTA case well beyond the 12-year statute of limitations. The Court lacks subject matter jurisdiction.

Even if the Court were to entertain the merits of Plaintiff's QTA case, summary judgment should be entered in favor of the United States and against Plaintiff. Plaintiff's Motion for Summary Judgment asserts an erroneous burden of proof and raises facts that support the United States' position. Plaintiff has admitted that the only basis for title left for Plaintiff to pursue is one predicated upon the operation of the Submerged Lands Act (SLA), 43 U.S.C. § 1311 et seq.[1] The Subject Property,[2] however, was excepted from operation of the SLA. Plaintiff's arguments to the contrary are meritless. First Plaintiff asserts that the burden for establishing an exception to the SLA rests with the United States. This is incorrect. As the SLA is a grant of public lands, it must be construed in favor of the United States, placing the burden on Plaintiff to prove that Congress intended to divest the public of ownership over the Subject Property. Second, Plaintiff argues that the Subject Property was not excepted from the SLA under the filled in, built up, or

---

[1] Plaintiff has abandoned any legal theory of original title in the State of Florida prior to 1953.
[2] "Subject Property" in this case refers to the property at issue in the litigation, defined as "approximately thirty-nine acres of submerged lands, . . . including a spoil island encompassed by the thirty-nine acres of submerged lands known as Wisteria Island or Christmas Island ('Wisteria Island'), all of which are located northwest of the Island of Key West in Monroe County, Florida." Complaint, ¶2 [D.E. 1].

otherwise reclaimed lands exception because the Subject Property was created during a dredge project undertaken by and for the United States and was used as a spoil location during that project. Plaintiff's argument, and the facts raised in support of it, establish the opposite finding: the Subject Property was filled in, built up, or otherwise reclaimed by the United States for its own use and, therein, excepted from the SLA. Plaintiff fails to identify any law in support of its argument and all of the law cited in this case supports the United States' position. Summary Judgment should be granted in favor of the United States.

II.   **Plaintiff File Its Complaint More Than 12 Years After the QTA Statute of Limitations Accrued: the Court Lack Subject Matter Jurisdiction**

A. **Upon Notice of the Claim of the United States the Statute of Limitations Shall Accrue**

In Plaintiff's Motion for Summary Judgment, Plaintiff is once again conflating two distinct statutory subject matter jurisdictional requirements: (1) when the Court has the jurisdiction to haul the United States into court as a defendant under the QTA; and (2) when the statute of limitations for a cause of action brought under the QTA accrues. These requirements are separate and distinct.

As to the first, the QTA requires that there be a "disputed title" in order for the Court to exercise subject matter jurisdiction over the United States. 28 U.S.C. § 2409a(a). This requirement, however, must be measured when the cause of action is filed with the court. The QTA expressly states that "[t]he United States **may be named as a party defendant** in a civil action under this section **to adjudicate a disputed title** to real property . . . ." Id. (emphasis added). The express language of the statute requires the Court to determine if there is a disputed title at the time the United States is named as a party defendant, not at any time prior to that.

3

The requirement of a "disputed title" is not related to (and is not repeated) in the statute of limitations for the QTA.  The QTA expressly requires that a QTA "action **shall be deemed to have accrued** on the date the plaintiff or his predecessor in interest **knew** or should have known **of the claim of the United States**."  28 U.S.C. § 2409a(g) (emphasis added).  Requiring a dispute to title prior to accruing the statute of limitations is contrary to the express language of the statute and would negate congressional intent.

For example, assume that the United States purchased a property in 1951 from two parties that each own 50% of the property, party A and party B.  Both party A and party B are parties to the sale with the United States and both have actual knowledge of the United States' claim as of 1951.  Nonetheless, in 1953, party A issues a deed to party B for party A's share of the property (the same share it previously sold to the United States), creating a dispute to title.  If party B wanted to sue the United States under the QTA to quiet title to the property, party B would have to sue the United States within 12 years of 1951, the date it knew of the claim of the United States, not from 1953, the date a dispute to title was created.[3]

### B.  Regardless, All the Undisputed Evidence Establishes That There Was A Disputed Title in 1951

That being said, even if the Court were to require a disputed title in order for the QTA statute of limitations to accrue, the undisputed evidence in this case establishes a that a dispute to title existed in 1951 when the claim of the United States was known to Plaintiff's predecessor in interest, Florida; and Plaintiff has introduced no contrary evidence to establish that there was no dispute to title.  Plaintiff merely argues, in a conclusory fashion, that the Supreme Court decision in United States v. California, 332 U.S. 19 (1947), "closed the courthouse door to any challenge

---

[3] Conversely, if there was a disputed title at the time of accrual (i.e., when the claim of the United States is known or should be known), a dispute to title at that time is irrelevant to the QTA's requirement of a disputed title for jurisdiction.  There must be evidence that there is a disputed title when the United States is named as a defendant in the case—not when the cause of action accrues for statute of limitations purposes.

to federal ownership" over the Subject Property and that thereafter, the "claim of ownership was not subject to dispute."  F.E.B.'s Motion [D.E. 57] p.18.  While Plaintiff is correct that <u>California</u> definitively established legal ownership over the Subject Property in the United States (assuming, *arguendo*, that it was not already previously reserved therein); that does not mean that a factual dispute to title could not exist.  The mere fact that the United States would conclusively win any dispute legally should it be litigated does not mean that there was no factual dispute.  It only means that the United States should win the dispute.

The undisputed evidence in this case establishes that there was a factual dispute to title in 1951.   In 1951, five years after <u>California</u>, the Trustees of the Internal Improvement Fund of Florida (TIIF) issued a notice of its intention to "sell" the Subject Property.[4]  On January 7, 1952, in response to the Navy's objection to the proposed sale by TIIF on the grounds that the United States had fee simple ownership over the Subject Property, the Florida Attorney General issued a letter in which he stated that he was "unable to state definitely whether or not the Navy's claim is valid."  Complaint Exhibit EE [D.E. 1-33].  The Attorney General concluded that the United States' claim was "debatable enough" that "the best course would be for the Trustees to complete the sale and explain the Navy's claim to Mr. Papy and allow him to accept the Trustees' deed at his own risk."  <u>Id</u>.  The Attorney General opined that the deed would place Mr. Papy "in position to defend the title" as of the issuance of the deed in 1952.  <u>Id</u>.  Two days later, on January 9, 1952, TIIF issued a deed for the Subject Property.

The undisputed evidence in this case clearly establishes that Florida subjectively believed (albeit erroneously) that it had a claim to the Subject Property in 1951 sufficient to issue a deed to a party for the Subject Property and to have that party stand in a position to defend that deed. Moreover, the mere issuance of an errant deed creates an objective dispute to title.   It is

---

[4] TIIF issued the notice in direct response to a request by an agent of the eventual deed holder, Mr. Papy.

incongruous to argue that the issuance of a deed to a property, over the objection of another party that claims ownership of the property, does not create a dispute to title in that property merely because the errant deed has no legal merit.  Until the errant deed is ruled legally deficient (or otherwise removed), the existence of the errant deed *per se* creates a dispute to title.

### C. Nonetheless Plaintiff Attempts to Use Artful Pleading to Circumvent the QTA's 12-Year Statute of Limitations

Plaintiff appears to be (once again) abandoning an argument it previously presented to the Court.  In FEB's Memorandum in Response to Order Requiring Parties to Brief Issues [D.E. 36], Plaintiff argued, for the first time, that the QTA requires a disputed title for the accrual of the statute of limitations and that there was a dispute of fact as to whether there was a disputed title in 1951.  The Court adopted Plaintiff's argument in the Order Denying Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [D.E. 38].  In Plaintiff's Motion for Summary Judgment, however, Plaintiff fails to present any evidence that would establish a question of fact for accrual, thereby abandoning that argument.  Moreover, Plaintiff fails to argue the disputed title theory in any depth at all.  Instead, Plaintiff appears to be arguing a question of law: can the SLA, passed in 1953 and after accrual of the QTA statute of limitations in this case, re-start the statute of limitations where the Plaintiff can articulate a legal theory that may establish ownership under operation of the SLA?

First, and foremost, the Supreme Court already addressed this exact issue in Block v. North Dakota, 461 U.S. 273 (1983).  In Block, North Dakota was seeking to quiet title to lands that it contended were navigable and, therein, passed to the state under operation of the equal footing doctrine and the SLA.  The question before the Supreme Court was whether the QTA's

statute of limitations applied to the state.[5]   The Supreme Court, construing the waiver of sovereign immunity narrowly and in favor of the United States, ruled that it did.  Id. at 288-89.

Thereafter, the Supreme Court addressed the argument that any QTA claim that accrued prior to the passage of the SLA would be resurrected by the passage of the SLA where it can be shown that the property in question may fall under the SLA.  Block, 461 U.S. at 291.  The Supreme Court disagreed with this argument.  First, the Supreme Court held that "[a] dismissal pursuant to § 2409a(f) does not quiet title to the property in the United States.  The title dispute remains unresolved."  Id.[6]  Thereafter, the Supreme Court found that the fact that the dispute remains unresolved "answers the argument that our holding conflicts with the Submerged Lands Act of 1953, 43 U.S.C. § 1311."  Id. at 291 n.27.  The Court explained that if North Dakota could establish (in the property forum/venue)[7] that the land passed by operation of the SLA, then "the land in question belongs to North Dakota, in accordance with . . . the [SLA], regardless of whether North Dakota's suit to quiet its title is time-barred under § 2409a(f)."  Id.  The dispute to title was not resolved, only the question of the means to litigate it and the lack of a waiver of sovereign immunity under the QTA.

Accordingly, Block conclusively answers Plaintiff's query: the QTA's statute of limitations accrues upon notice of the claim of the United States and any claim of legal ownership arising after the passage of the SLA does not resurrect the time-barred QTA cause of action.  In Block, the Supreme Court makes it clear that there is a difference between being able

---

[5] Block addressed a prior version of the QTA that did not distinguish between actions brought by states and individuals.
[6] The QTA reviewed in Block was a prior version in which the statute of limitations was contained in subsection (f).  The statute of limitations in the current version is found in subsection (g).
[7] While North Dakota would be barred from litigating its SLA claim under the QTA, as Block instructs, it may be able to "induce the United States to file a quiet title action against them, or . . . petition Congress or the Executive for discretionary relief."  Block, 461 U.S. at 280.

to raise a legal argument for title and being able to haul the United States into court to litigate that argument under the QTA.

Nonetheless, that is exactly what Plaintiff is trying to do: haul the United States into court, in violation of the QTA's express statute of limitations, to litigate a legal theory it manifested under its reading of the SLA.[8]  Plaintiff—without any legal basis—argues that it would "defy logic" to have "the limitations provision of the QTA run[] and forever bar[] a party's ability to have its title adjudicated before that party even acquires [a colorable legal theory to] title."  Motion [D.E. 57] p.19.

Plaintiff's "logic" argument defies the law and, therein, is patently illogical.  Prior to the passage of the QTA, parties (even states) were forever barred from hauling the United States into court to resolve disputes to title.

> Only upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land. Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute-they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief.

Block, 461 U.S. at 280.  In addition, the QTA's "legislative history [makes it] clear that Congress intended to **foreclose totally** any suit on claims that accrued more than twelve years prior to the effective date of the QTA."  Id. at 286 n.23 (emphasis added).  Accordingly, any

---

[8] At deposition, Plaintiff's corporate representative admitted that Plaintiff was not aware of any claim to title predicated upon the passage of the SLA prior to the commencement of the QTA cause of action (and the creation of this legal theory to circumvent the statute of limitations):

> [Q] What is F.E.B.'s claim to the subject property?
>  A.  F.E.B. relies upon the chain of title beginning with the deed from the trustees of the Internal Improvement Trust Fund.  And as I have since learned since the commencement of the quiet title action litigation, we are also relying upon the Submerged Lands Act of 1953.
> Q.  So prior to the commencement of the quiet title action, it's your understanding that F.E.B.'s basis for claim to the subject property was not tied to the Submerged Lands Act; is that correct?
>  A.  Well, it might have been tied to it, but we didn't know it.

Deposition of Roger Bernstein p.95 lns.7-21.  Defendant's Motion for Summary Judgment, Exhibit 1 [D.E. 59-1].

dispute to title that accrued prior to 1960 is forever barred, as Congress intended it to be.  See, e.g., Knapp v. United States, 636 F.2d 279, 282 (10th Cir. 1980) ("Thus, no cause of action was created for any title claim that accrued earlier than 1960.").

Furthermore, if Plaintiff's theory were adopted future plaintiffs would be able to circumvent the QTA's 12-year statute of limitations with similar tactics.  A plaintiff whose title dispute is foreclosed by the QTA's statute of limitations would only have to argue a colorable legal theory predicated upon the subsequent passage of a statute (or other change in circumstances) that would then resurrect the stale title dispute.[9]  If Plaintiff's theory were adopted, "the QTA's twelve-year statute of limitations, the one point on which the Executive Branch was most insistent, could be avoided, and, contrary to the wish of Congress, an unlimited number of suits involving stale claims might be instituted."  Block, 461 U.S. at 285.  "It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading."  Id.  Plaintiff's theory requires the "suspension of disbelief" in order to circumvent Congress's careful and thorough remedial scheme.    Plaintiff's theory is nothing more than self-serving artful pleading and must be rejected.  This case must be dismissed for lack of subject matter jurisdiction.

**D.  Plaintiff's Reliance on Werner and Other Easement Cases Is Unavailing**

Plaintiff relies on Werner,[10] and cases cited in Werner, in support of an argument that only a claim made by the United States that is adverse to the Plaintiff's interest can accrue the

---

[9] To allow such artful pleading also raised the question of what happens if a court rules that the intervening statute (or change in circumstance) did not pass title?  Is the court then divested of subject matter jurisdiction—after it has reached the merits—because the asserted basis for the resurrection of QTA jurisdiction failed?  Or, if the court rules that the intervening statute (or change in circumstance) did not confer title to the plaintiff, could the court, nonetheless, retain jurisdiction and decide whether title passed on an alternate theory that predated the original accrual of the QTA statute of limitations?  Would the court be limited to hearing only evidence related to the intervening statute (or change in circumstance)?

[10] After the Eleventh Circuit found that the statute of limitations was not violated in Werner, the case was remanded to the District Court.  Upon remand, the District Court ruled in favor of the United States (i.e., the District Court

QTA's statute of limitations.  This argument is unavailing, as is Plaintiff's reliance upon <u>Werner</u>. First, the claim of the United States is adverse to Plaintiff's claim in this case.  The 1951 claim of the United States is a claim for fee simple ownership.   Plaintiff claims it holds fee simple ownership.  The claims are adverse.

Second, <u>Werner</u> is an easement case and is absolutely distinguishable on that ground alone.  In a fee simple context, any claim of interest sufficient to give notice of a cloud on title— even an erroneous claim—is sufficient to trigger the QTA's statute of limitations.  "An easement, of course, is different."  <u>McFarland v. Norton</u>, 425 F.3d 724, 726-27 (9th Cir. 2005).   In an easement case, unlike a fee simple case, "the triggering event for statute of limitations purposes [is] not the time at which the claimants knew that the government was owner but the time at which they knew or should have known that the government claims that it could deny use by the plaintiffs of the access road to their property because there was no easement (or only limited easement) permitting such use."  <u>Werner</u>, 9 F.3d at 1519.  <u>See also Michel v. United States</u>, 65 F.3d 130, 132 (9th Cir. 1995) ("If a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period. But when the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim.") (internal citation omitted); <u>Kingman Reef Atoll Investments v. United States</u>, 541 F.3d 1189, 1199 (9th Cir. 2008) (limiting the easement abandonment theory expressed in <u>Shultz v. Department of Army</u>, 886 F.2d 1157 (9th Cir.1989) to claims for an easement because a claim of

---

held that there was no right to an easement by necessity).  That ultimate ruling was affirmed by the Eleventh Circuit in an unreported opinion.  <u>Werner v. United States</u>, 68 F.3d 486 (1995).  The plaintiff in <u>Werner</u> petitioned for a Writ of Certiorari, challenging the ultimate ruling on the easement issue.  The statute of limitations issue was not presented to the Supreme Court in the petition for Writ of Certiorari.

"ownership interest over government property . . . is different from a plaintiff's claim of an easement.").

Although <u>Werner</u> is absolutely distinguishable on the ground that it deals with an easement, whereas the present case addresses fee simple ownership, <u>Werner</u> is further distinguishable because it is a case where there was no actual notice.  In <u>Werner</u>, the Eleventh Circuit held that actual notice of a claim of fee simple ownership does not serve as notice of a claim for easement restriction purposes.  Accordingly, <u>Werner</u> applied the reasonableness test to determine when the plaintiff should have known that the United States sought to restrict access— even though there was prior actual notice of the United States' fee simple ownership claim.

In the present case, it is undisputed that Florida had actual notice of the claim of the United States.  The claim is for fee simple ownership.  The reasonableness test does not apply.  <u>See e.g.</u>, <u>California v. Yuba Goldfields, Inc.</u>, 752 F.2d 393, 396 (9th Cir. 1985) ("In the case at bar, the court need not mull over the issue of whether California 'should have known' of the United States' claim, for California had actual knowledge of that claim.").

Third, <u>Vincent Murphy Chevrolet Company v. United States</u>, 766 F.2d 449 (10th Cir. 1985), the case expressly distinguished by <u>Werner</u>, is more analogous to this case than <u>Werner</u> or any case relied upon in <u>Werner</u>.[11]  In <u>Vincent Murphy</u>, the plaintiffs asserted the same legal theory that Plaintiff argues in this case in an attempt to circumvent the QTA's 12-year statute of limitations.  The Tenth Circuit rejected this theory in <u>Vincent Murphy</u> and the Eleventh Circuit expressly distinguished it in <u>Werner</u>.

In <u>Vincent Murphy</u>, two plaintiffs brought a cause of action against the United States seeking to quite title to three parcels of property.  <u>Vincent Murphy</u>, 766 F.2d at 450.  By way of

---

[11] The United States maintains that easement cases are not instructive when analyzing a claim for fee simple ownership.  Nonetheless, even under the easement cases, the case most analogous to this case supports the United States' position.

the QTA action, the plaintiffs sought to have restrictive easements and covenants, which favored the United States, declared invalid and unenforceable as to the plaintiffs/property owners.  The first plaintiff had purchased all three parcels from the United States at public sale in late 1964 and early 1965.  The second plaintiff acquired one of the three parcels from the first plaintiff.  Id.

The 1964 and 1965 sales were executed by a quitclaim deed from the United States to the first plaintiff.  Id.  The quitclaim deed contained express restrictions for use by the land owner and reserved easements for the United States' use.  The plaintiffs argued that the "restrictions were imposed for safety reasons in light of the nearby military activity at the time."  Id.  "The military activity around these parcels has ceased since the time of the land transfer and much of the surrounding land has been sold, subdivided, and developed."  Id.  The plaintiffs maintained that the restrictions and easements became "invalid and unenforceable when changing conditions frustrate the original purpose of the easement or covenants."  Id. at 451.  Thereafter, predicated upon this theory of changed circumstances, the plaintiffs argued that "the limitations period did not begin to run at the time [the first plaintiff] obtained the quitclaim deeds and notice of the restrictions, but rather began when surrounding circumstances changed to the extent that the appellants would have a viable cause of action."  Id.

> For purposes of determining when the claim accrues under § 2409a(f), appellants propose that the "claim" of the United States is not that the restrictions were valid in 1964–1965, but that the United States insists that the restrictions are still valid in spite of the changed conditions which have frustrated the original purpose of the restrictions.

Id.

The Tenth Circuit rejected this argument.  First, because the plaintiffs had actual notice of the claim in Vincent Murphy, the Tenth Circuit distinguished cases that used a "reasonableness test" for the accrual of the statute of limitations.  Id.  The reasonableness test is used only where

12

there is a question of whether the plaintiff or his predecessor in interest "should have known" of the claim of the United States, not when there is actual notice.  Id.  See also California v. Yuba Goldfields, Inc., 752 F.2d 393, 396 (9th Cir. 1985).  Similarly, in the present case, there was actual notice of the claim of the United States.

Second, the Tenth Circuit quoted Block for the proposition that the QTA "could not be interpreted in such a manner as to 'extend the waiver beyond that which Congress intended.'" Vincent Murphy, 766 F.2d at 452 (quoting Block, 461 U.S. at 287).  "To hold that the twelve-year statute of limitations did not begin to run until conditions began changing would give rise to an interpretation of the term 'claim' under § 2409a(f) which could extend the limitations period indefinitely."  Id.  See also Richmond, Fredericksburg & Potomac R.R. Co., 945 F.2d 765, 770 (4th Cir. 1991) (citing Block, 461 U.S. at 287) ("To hold that the limitations period did not begin to run until conditions had changed and the government reasserted its claim would be in effect to extend the limitations period indefinitely, in contravention of Congress's expressed intent.").

As in the present case, the plaintiffs in Vincent Murphy argued that accrual could not begin until after the change in conditions because they did not have a cause of action until the conditions changed.  Vincent Murphy, 766 F.2d at 452.  Effectively the plaintiffs were arguing that the statute of limitations could not accrue until their current legal theory becomes viable. This is essentially the same argument raised by Plaintiff in the present case.  "While such argument evokes empathy, we do not believe that it comports with the limited waiver of sovereign immunity Congress intended, and in construing the statute of limitations strictly as a condition to the waiver of sovereign immunity, we must reject appellants' argument."  Id.  So to, this Court must reject Plaintiff's argument.

### III.    Even If There Was Jurisdiction, the United States Wins on the Merits

Plaintiff has admitted that Florida did not hold title to the Subject Property when it issued a deed for the Subject Property in 1952.  Nevertheless, Plaintiff argues that the invalid 1952 deed "immediately became valid upon passage of the SLA pursuant to the after-acquired-title doctrine."  F.E.B.'s Motion [D.E. 57] p.7.  Plaintiff has abandoned all legal theories of ownership apart from a theory that Florida acquired the Subject Property by operation of the SLA and that Plaintiff has current title from Florida under the operation of the after-acquired-title doctrine.  The Subject Property, however, was excepted from operation of the SLA, and title never passed from the United States to Florida.  The court need not reach the question of the applicability of the after-acquired-title doctrine in this case[12] because Florida never obtained title and, therefore, never could convey title or correct the invalid prior conveyance.

Plaintiff begins its merits argument by setting forth an erroneous standard.  Plaintiff argues that **the United States bears the burden** of proving that the Subject Property was excepted from operation of the SLA.  F.E.B.'s Motion [D.E. 57] p.11.  While Plaintiff is correct that there is a "general rule" that places the burden to establish an exception to a statute upon the party raising the exception, that rule applies only "where one claims the benefits of an **exception to the prohibition of a statute**." United States v. Endotec, Inc., 563 F.3d 1187, (11th Cir. 2009) (quoting United States v. First City Nat. Bank of Houston, 386 U.S. 361, 366 (1967) (emphasis added).  There is no corresponding rule where the United States has included an exception to a statute granting public lands.[13]  Rather, the opposite is true: land grants must be strictly

---

[12] There is still an unresolved issue as to whether the after-acquired-title doctrine would apply in this case and if Plaintiff would even have a procedural mechanism to pursue such a resolution.  Without both, Plaintiff would not have standing to sue under the QTA as it would not be a proper party with a viable interest in the Subject Property.

[13] In addition, the United States was unable to locate a single case in which the United States bore the burden of establishing the application of an exception to any statute, and Plaintiff fails to identify any such case.  The majority of the cases addressing this issue do so in the criminal context: i.e., a criminal defendant bears the burden of proving that he is innocent because he fits within an exception to a criminal statute.  The rest of the cases—including

construed in favor of the United States.  <u>United States v. Union Pac. R. R. Co.</u>, 353 U.S. 112, 16 (1957) (citing <u>Caldwell v. United States</u>, 250 U.S. 14, 20-21 (1919)).  As the SLA is a statutory grant of land, "the scope of that grant must be construed strictly in the United States' favor." <u>United States v. Alaska</u>, 521 U.S. 1, 33 (1997).  <u>See also California ex rel. State Lands Comm'n v. United States</u>, 457 U.S. 273, 287 (1982).

Regardless of who bears the burden in this case, the undisputed evidence and controlling law clearly establish that the Subject Property was excepted from the SLA.[14]  In <u>California ex rel.</u>, the Supreme Court found that Congress intended to "assure each sovereign the continuing benefit of landfill and like work performed by each" when Congress added the filled in, built up, or otherwise reclaimed land exception to the SLA.  <u>California ex rel. State Lands Comm'n v. United States</u>, 457 U.S. 273, 287 (1982).  Accordingly, pursuant to the Supreme Court's reasoning in <u>California ex rel.</u>, whenever the United States makes land (i.e., fills in, builds up, or otherwise reclaims land) and that land is made through or by a project undertaken by the United States for the United States' own use, the created land is excepted from operation of the SLA.

In the present case, Plaintiff does not contest that the Subject Property was filled in, built up, or otherwise reclaimed by the United States; that the Subject Property was created during a dredge project conducted for the Navy in the 1940s; that the purpose of the dredge project was for United States' own use; and that the Subject Property was designated as a spoil area during that project.[15]  Therefore, it is undisputed that the United States filled in, built up, or otherwise

---

Endotec, cited by Plaintiff—arise in the context of a party seeking to avoid enforcement under a statute on the basis that the party is excepted from the prohibition of that statute.

[14] For purposes of summary judgment only, the United States addresses only the filled in, built up, or otherwise reclaimed land exception.  Should the case go to trial, the United State reserves the right to litigate the remainder of the exceptions to the SLA.  Of note, Plaintiff miscounts the number of exceptions to the SLA.  Plaintiff states that there are four when there are five exceptions included in 43 U.S.C. § 1313(a).  Plaintiff erroneously combines the last two exceptions into one.

[15] There is also evidence that the Subject Property was used as a spoil area in the 1920s and the 1960s.

reclaimed the Subject Property for its own use.[16]   The United States should be assured of the "continuing benefit of landfill and like work performed by [it]."   <u>California ex rel.</u> at 287.

Plaintiff, nonetheless, contends that the exception does not apply.   Plaintiff, however, fails to introduce any case law, statutory interpretation, or legislative history in support of its position.   Rather, Plaintiff merely cites to a few facts in evidence and argues that they establish that the exception does not apply to the Subject Property.   Plaintiff's position here is meritless.

All of the facts referenced by Plaintiff support a finding that the Subject Property was excepted from operation of the SLA under the filled in, built up, or otherwise reclaimed land exception.   First, contrary to Plaintiff's assertion, the 1956 letter from the Chief of the Bureau of Yards and Docks does not conclude that the Subject Property was not filled in, built up, or otherwise reclaimed by the United States for its own use.   A copy of the signed 1956 letter is attached to the United States of America's Response to F.E.B.'s Statement of Material Facts as Exhibit 1.[17]   Rather, the Chief of the Bureau of Yards and Docks merely stated that "[i]t would appear" that "the Navy would have a difficult time in proving that this island was built up for Federal use."   <u>Id</u>.   The Chief of the Bureau of Yards and Docks' analysis came at a time when the Navy was contemplating legal action to challenge the deed issued by Florida in 1952.

---

[16] In addition, as discussed fully in Defendant's Motion for Summary Judgment [D.E. 59], there is undisputed evidence in this case that the United States had previously used the Subject Property and had future use plans for the Subject Property.

[17] Even if the Court were to agree with Plaintiff's mischaracterization of the 1956 letter and find that an agent of the United States reached a conclusion that could be read to divest the United States of ownership of the Subject Property, that factual finding would have no legal significance.

> The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.

<u>California</u>, 332 U.S. at 40.   This same principle relates to all the various facts raised by Plaintiff in the Statement of Facts and the Motion where Plaintiff asserts that agents of the United States concluded that Plaintiff owned the Subject Property.   These statements are not legally binding upon the United States and have no legal significance in determining whether the United States holds title to the Subject Property.

Previously the Bureau of Yards and Docks, Real Estate Division, had said that the Navy "Department is prepared to show that if ownership was originally in the United States, it is excepted by Section 5 of [the SLA] from any proprietary rights inuring to the State by reason of that Act." Exhibit 31 to Defendant's Statement of Undisputed Facts [D.E. 58-31]. In the 1956 letter, it appears that the Chief of the Bureau of Yards and Docks was merely cautioning that legal action may be difficult and that the Navy should be prepared to condemn the land should it move forward with legal action. At the same time, the Chief of the Bureau of Yards and Docks indicated that "the only reason for the establishment of the island in 1943 was a site for the deposit of spoil." United States of America's Response to F.E.B.'s Statement of Material Facts, Exhibit 1. This reason alone excepts the Subject Property from the SLA. Moreover, there is additional evidence of use not recognized by the Chief of the Bureau of Yards and Docks.

Next, Plaintiff cites to the testimony of George Toppino. Once again, Toppino's testimony supports the United States' position, not Plaintiff's. Toppino testified that when he was 14 years old he helped his father who was working on the 1940s Key West Harbor dredge project; Deposition of George Toppino p.6 lns.12-17, p.13 lns.8-10; that the 1940s dredge project was being conducted for the United States' use; id. p.7 lns.8-17, p.15 lns.16-25, p.16 ln.1; that dredge was placed on the Subject Property during the 1940s project; id. at p.8 lns.23-25, p.9 lns.1-5; and that the Subject Property was one of three areas (that Toppino was aware of) used during the project for the placement of spoil; id. at p.14 lns.19-25, p.15 lns.1-15. Toppino's testimony establishes that the United States conducted a dredge project for its own use which resulted in the creation of islands in designated spoil areas. This testimony establishes that the Subject Property is excepted from the operation of the SLA.

Finally, Plaintiff references a deed entered into by TIIF and the United States in 1946 for four spoil islands created during the same 1940s dredge project that filled in and built up the Subject Property.  A copy of the deed is attached to the Complaint as Exhibit C [D.E. 1-5].[18] While Plaintiff does not flush out its argument here, the implication is that because the United States acquired a deed for these four similar spoil islands, and not one for the Subject Property, it means that the other four spoil islands were filled in, built up, or otherwise reclaimed by the United States for its own use but the Subject Property was not.  Plaintiff's implied argument is unsound.

The fact that the United States had acquired a deed to the other islands created by the United States at the naval station in Key West supports the only reasonable finding: when Congress added the filled in, built up, or otherwise reclaimed land exception, it intended to except the Subject Property.  The legislative history of the SLA makes clear that the Navy wanted to except lands filled at the naval station in Key West and that this exception was meant to apply to filled in lands that the United States had not otherwise acquired title for.  Submerged Lands Act of 1953: Hearing on S.J. Res. 13 Before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 544 (1953) (statement of Hon. Robert B. Anderson, Secretary of the Navy) [D.E. 24-7].  As there was a title for the other four spoil islands (and they were, therein, excepted under a different section of the SLA), the filled in, built up, and otherwise reclaimed land exception was not added to address those spoil islands.  Rather, it was added by Congress in direct response to the Navy's request to except the Subject Property and any other properties like the Subject Property at naval station Key West.

---

[18] The deed was issued in 1946, the year before the Supreme Court ruling in California that resolved any dispute over the ownership of these properties.  The deed was for $1.00 for all four properties.  It appears that this deed was entered into in an abundance of caution in anticipation of the Supreme Court's ruling.

IV.     Conclusion

The plain language of the QTA and the undisputed evidence establish that the QTA's 12-year statute of limitations accrued in 1951.  Plaintiff's efforts to circumvent the QTA's 12-year statute of limitations through artful pleadings fail.  The Court lacks subject matter jurisdiction. This case must be dismissed.

If the Court were to find jurisdiction (where none exists) and reach the merits, the undisputed evidence, the SLA and its legislative history, and case law establish that the United States filled in, built up, or otherwise reclaimed the Subject Property for its own use.  The Subject Property was excepted from operation of the SLA.  The United States has held uninterrupted title to the Subject Property since it originally acquired the Subject Property from Spain in the early 1800s.  Summary judgment should be entered in favor of the United States and against Plaintiff.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

s/Anthony Erickson-Pogorzelski
ANTHONY ERICKSON-POGORZELSKI
ASSISTANT U.S. ATTORNEY
99 N.E. 4th Street, 3rd Floor
Miami, Florida 33132
Tel: (305) 961-9296
Fax: (305) 530-7139
Fla. Bar 619884
Email: anthony.pogorzelski@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/Anthony Erickson-Pogorzelski
Assistant United States Attorney